ECONOMY FIRE AND CASUALTY COMPANY, Plaintiff-Appellee, v. WINDY DEAN-COLOMB, Defendant (John Nottoli, Inc., Defendant-Appellant).

Fourth District   No. 4—94—0643

Opinion filed January 26, 1995.

James P. Ginzkey, of Hayes, Hammer, Miles, Cox & Ginzkey, of Bloomington, for appellant.

Karen L. Kendall, of Heyl, Royster, Voelker & Allen, of Peoria, and James C. Kearns, of Heyl, Royster, Voelker & Allen, of Urbana, for appellee.

JUSTICE LUND delivered the opinion of the court:

This is an appeal by defendant John Nottoli, Inc. (Nottoli), from a judgment by the circuit court of Champaign County granting plaintiff Economy Fire and Casualty Company (Economy) summary judgment and denying defendants' motion for summary judgment. Plaintiff brought this declaratory judgment requesting that plaintiff's automobile policy, issued to Windy Dean-Colomb on her 1988 Ford Tempo (Tempo), be interpreted as not covering an accident involving a 1993 Buick Regal rented to Dean-Colomb by Nottoli.

Dean-Colomb's automobile policy with plaintiff provided in part:

"Your covered auto means:

\* \* \*

D. any auto or trailer you do not own while used as a temporary substitute for any other vehicle described in the definition which is out of normal use because of its breakdown, repair, servicing, loss or destruction. This provision (D.) does not apply to Coverage For Damage To Your Auto."

Dean-Colomb rented the Buick for a trip to Baton Rouge, Louisiana, and her brother and two friends accompanied her on the trip. The insured Tempo was not used for the trip, presumably because of its high mileage (80,000 to 90,000 miles) and fuel line problems. The brother was in an accident on March 14, 1993, while using the rented vehicle, and Dean-Colomb was named as defendant in an action brought by Nottoli. Plaintiff brought this declaratory judgment action, seeking a determination of no liability under its policy insuring the Tempo.

Motions for summary judgment were brought by both Economy and Nottoli. The trial court's findings included the following:

"5. At the time Dean-Colomb rented the Buick her 1988 Ford Tempo was driveable and was not scheduled for maintenance or repair and was not undergoing repair. In the week prior to making the trip to Louisiana Dean-Colomb drove the Ford Tempo. It was left in Dean-Colomb's driveway while she traveled to Louisiana.

6. The Tempo had 80,000 to 90,000 miles on it. Dean-Colomb occasionally had troubles with the Tempo—'it wasn't running properly. It didn't seem to be getting gas. So I felt that probably maybe the fuel injection system needed to be cleaned and probably a tune-up. It was idling really high and, you know, stuff along those lines.' *** In the two-month period before the Louisiana trip the Tempo sometimes had not started or it had stalled."

The trial court found as a matter of law that the rental automobile did not qualify as a substitute and was excluded from coverage.

The issue is narrow: what constitutes being withdrawn from normal use because of breakdown, repair, and servicing. There appears to be no question but that the Tempo was operational and not scheduled for repair. Use of the rented Buick may have resulted from a lack of confidence in the Tempo's ability to make the round trip from Champaign to Baton Rouge. In Dean-Colomb's deposition, she testified as follows:

"Q. [Plaintiff's counsel:] Okay. Just out of curiosity, your Tempo, the 1988 Tempo, while you were down in Louisiana, was the Tempo in for any type of work? In other words, since you knew you were going to be out of town and not driving it, did you schedule any type of maintenance for that car at that time?

A. [Dean-Colomb:] No.

Q. Okay. It was just a matter of you felt safer driving that distance in a newer car rather than in the Tempo?

A. Correct.

Q. Had you had any type of mechanical problems with the Tempo?

A. Yes.

Q. What were those problems?

A. I felt that it—it wasn't running properly. It didn't seem to be getting gas. So I felt that probably maybe the fuel injection system needed to be cleaned and probably a tune-up. It was idling really high and, you know, stuff along those lines.

Q. Had it not started or had it stalled or anything for you in say the two-month period prior to this trip down to Louisiana?

A. Yes."

■ In *Standard Mutual Insurance Co. v. Sentry Insurance of Illinois, Inc.* (1986), 146 Ill. App. 3d 905, 497 N.E.2d 476, the trial court's finding that the substituted automobile was covered by the insurance policy was affirmed. There, the insured automobile was pulling to the right when braked and attempts made to obtain immediate repair were unsuccessful. The insured automobile was not at the repair shop. Sentry made the following statement:

"Sentry further contends that the trial court's finding that Wigfield used the Saffer vehicle as a temporary substitute is erroneous. In construing contracts of insurance, courts are to follow the general contract rule that the agreement should be viewed as a whole to determine the intention of the parties to the contract and the purpose which they sought to accomplish. [Citation.] Where the provisions are not ambiguous, a court should enforce them according to their plain meaning. [Citations.]

A typical 'substitution' provision generally covers a vehicle not owned but temporarily used by the insured because the owned vehicle has been withdrawn from normal use due to breakdown, repair, servicing, loss or destruction. (See 7 Am. Jur. 2d *Automobile* [*Insurance*] sec. 236 (1980).) Although we are unable to locate Illinois decisions which discuss the purpose of such a provision, courts in other jurisdictions have specifically addressed this issue. These decisions indicate that a typical provision is for the benefit of the insured and, if construction is necessary, it is to be construed liberally in favor of the insured. [Citations.] It has been stated further that the purpose of a temporary-substitute-automobile provision is not to defeat liability but, rather, to provide additional coverage for the insured, yet reasonably define coverage by limiting the insurer's risk to one operating vehicle at a time for a single premium. [Citations.] We agree with such interpretations.

In the instant case, Sentry contends that the trial court's finding that Wigfield used the Saffer automobile as a temporary substitute for her Chevrolet Vega was improper because the policy provision covers a substitute only when the owned vehicle is being

serviced or repaired and not under other conditions. We believe that Sentry's interpretation of the provision is unduly restrictive and would defeat the purpose of the inclusion of such a provision in the policy if so construed. Wigfield's testimony revealed that she attempted to get her Vega repaired on April 8 prior to deciding to use the Saffer vehicle. It is evident that Wigfield's determination that the car was unsafe to drive and in need of repair led her to withdraw it from normal use. Such circumstances bring her use of the Saffers' car within the 'substitution' provision of the Sentry policy. We therefore hold that the trial court's finding that the vehicle was a temporary substitute was not contrary to the manifest weight of the evidence presented. On this basis, Sentry is obligated to defend and indemnify Wigfield in the personal injury action, and we need not address Sentry's further contentions that it provide only excess coverage or coverage on a *pro rata* basis." *Standard*, 146 Ill. App. 3d at 910-11, 497 N.E.2d at 479-80.

Here, we do not have an insured vehicle unsafe to drive; we have a vehicle the owner did not trust for a long trip. We have no evidence of seeking repairs. We have a concerned owner, but we also have an automobile normally used within the community where Dean-Colomb resided and there was no evidence indicating impairment of that "normal use." Section 237 (7 Am. Jur. 2d *Automobile Insurance* § 237 (1980)) is more informative as to the issue in this case than is section 236, which is cited in *Standard*. However, case law relating to like-kind provisions in automobile policies appears to lead to different interpretations. It is apparent that the insured automobile in *Standard* was operable, but possibly dangerous. Overall, it did not fail to function.

We find it necessary to consider the term "normal use" as it might modify the term "breakdown." If we determine that "normal use" does not include occasional trips to meetings and to visit family, and only includes driving within the community where the insured lives, then it would appear the automobile coverage was limited because the insured's vehicle was operational for normal use. However, such a limited definition of "normal use" is unrealistic. An obvious use for automobiles includes out-of-town trips. We then must decide if the fear of a breakdown amounts to a "breakdown."

Various cases give some guidelines. Frequent stalling has been held to constitute a breakdown. (*Allstate Insurance Co. v. Roberts* (1958), 156 Cal. App. 2d 755, 320 P.2d 90.) Coverage was upheld where the automobile was used temporarily for a pickup with a flat tire. (*Home Indemnity Co. v. Godley* (1970), 122 Ga. App. 356, 177 S.E.2d 105.) Bad tires constituted a "breakdown" in *Fullilove v. United*

*States Casualty Co.* (1960), 240 La. 859, 125 So. 2d 389. (See also *Mid-Continent Casualty Co. v. West* (Okla. 1959), 351 P.2d 398.) A broken wheel bearing was included within the term "breakdown" in *Hunnicutt v. Shelby Mutual Insurance Co.* (1961), 255 N.C. 515, 122 S.E.2d 74.

Some decisions have been based upon whether the insured vehicle was available for use by others. (*Earl v. State Farm Mutual Automobile Insurance Co.* (Mo. App. 1991), 820 S.W.2d 623; *Atkinson v. State Farm Mutual Automobile Insurance Co.* (1984), 18 Ohio App. 3d 59, 480 N.E.2d 819.) However, the use of the insured vehicle during the Baton Rouge trip is not an issue in this case.

In ruling on a motion for summary judgment, the court should construe pleadings, depositions, admissions, exhibits, and affidavits strictly against the movant and liberally in favor of the nonmoving party. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240-41, 489 N.E.2d 867, 871.) The purpose of summary judgment is not to try questions of fact, but rather to determine if such questions of fact exist. *Addison v. Whittenberg* (1988), 124 Ill. 2d 287, 294, 529 N.E.2d 552, 555.

■ For purposes of this decision, we must assume that Dean-Colomb was aware of some fuel injection problems with the insured vehicle and that she was apprehensive in using the Tempo for the Baton Rouge trip. We must also assume that the Tempo was driven up to the time of the trip to Baton Rouge.

We hold the plain meaning of the insurance provisions requires a determination that the Buick was not a qualified substitute vehicle under the policy because the insured vehicle did not meet the "breakdown" test. In so ruling, we emphasize the importance of the facts that the vehicle had been used up until the time of the trip and had not been scheduled for repair. We conclude any other ruling would render policy limitations meaningless. An insured could always have a suspected problem with the insured vehicle, thus extending coverage to other vehicles the insured might drive. We specifically note the fact difference in *Standard*, where there was evidence of an attempt to obtain repairs.

Affirmed.

GREEN and STEIGMANN, JJ., concur.